**EXHIBIT "B"**
**DOCKET NO. 08CV00080**
**ELIZABETH LYNCH**
**AMENDED NOTICE OF CLAIM**

## AMENDED NOTICE OF CLAIM

-----------------------------------------------------

In the Matter of the Claim of

ELIZABETH LYNCH, SIMON LYNCH, ERIC LYNCH, Infants, under
the age of 14, by their mother and natural guardian
JESSICA LYNCH and JESSICA LYNCH Individually
and RICARDO LYNCH,

- against -

THE CITY OF MT. VERNON,

-----------------------------------------X

TO:     City of Mt. Vernon, City Clerk, Room 104, City Hall, Mount Vernon, New York 10550

        PLEASE TAKE NOTICE that the undersigned claimant hereby makes claim and demands
against you as follows:

### 1. Name and post office address of each claimant and claimants' attorneys is:

**Claimant**
ELIZABETH LYNCH, Infant
58 South 14th Avenue
Mt. Vernon, NY 10550

ERIC LYNCH, Infant
58 South 14th Avenue
Mt. Vernon, NY 10550

JESSICA LYNCH
58 South 14th Avenue
Mt. Nernon, NY 10550

RICARDO LYNCH
58 South 14th Avenue
Mt. Vernon, NY 10550

SIMON LYNCH , Infant
58 South 14th Avenue
Mt. Vernon, NY 10550

**Attorney**
DELL & LITTLE, LLP
1274 Reckson Plaza
Uniondale, New York 11556
(516) 294-5814

### 2. Nature of Claim: The nature of the claim is for severe and permanent personal injuries sustained
by infants ELIZABETH LYNCH, SIMON LYNCH, ERIC LYNCH, and  JESSICA LYNCH,
RICARDO LYNCH, loss of services, society and companionship sustained by JESSICA LYNCH,
parent and natural guardian of infants ELIZABETH LYNCH, SIMON LYNCH, ERIC LYNCH, and
all other damages allowed by statute and case law as a result of the negligence, carelessness,
recklessness and gross negligence of CITY OF MT. VERNON, their agents, servants and/or
employees, departments, agencies and those acting under their directions behest and control in the
operation, management, control and supervision of its Police Department and Officers involved in a

Police raid at Claimants' residence.

**3. The time when, the place where and the manner in which the claim arose:** Said claim arose on December 15, 2006, at approximately 5:00 a.m. in the basement apartment of 58 South 14th Avenue, Mt. Vernon, New York, State of New York when a number of Police Officers converged on the apartment with an arrest warrant for an individual named "Jay", who did not reside at the premises and was not know to the Claimants. The Police Officers broke down several doors, held their drawn weapons on the infants and forced them onto the floor, handcuffed claimants RICARDO LYNCH and JESSICA LYNCH and placed them on the floor, continued to ransack the entire apartment causing serious property damage to the apartment. The Officers in charge of said activity had lost control and/or failed to prevent the activities that caused the claimants to be falsely detained, arrested and harassed. THE CITY OF MT. VERNON, their agents, servants and/or employees, departments, agencies and those acting under their directions behest and control, were negligent in their failure to properly investigate and/or evaluate the results of any investigation of those persons, agents, servants and/or employees hired to operate, control, supervise, said Police raid; in failing to properly investigate circumstances which initiated the errant arrest warrant which resulted in the false arrest, detainment and harassment of the Claimants herein; in failing to hire efficient and/or sufficient personnel in connection with the operation, management, control, and/or supervision of said operation and serving of errant arrest warrant; in failing to train their employees so as to enable them to control themselves and/or persons in their charge; in failing to adequately train their employees so as to enable them to control the operation; in failing to properly and/or adequately supervise the activities which caused claimants to be falsely detained, arrested and harassed; in failing to properly and/or adequately monitor and/or supervise the activities and issuance of the arrest warrant on the day of the incident; in failing to properly and/or adequately screen the participants of the activity involved herein; in failing to adequately and/or properly categorize the participants in the activity involved herein; in failing to prevent and/or stop inappropriate activity in the premises; in failing to prevent said activity, in failing to stop said activity, and the respondent was otherwise negligent, careless, reckless, and grossly negligent in the premises.

4.  Claimants, JESSICA LYNCH, RICARDO LYNCH, and Infant-Claimants, ELIZABETH LYNCH, SIMON LYNCH and ERIC LYNCH, sustained severe permanent emotional distress and trauma, the full extent of which is not presently known. Claimant JESSICA LYNCH sustained loss of services and society of her said children, ELIZABETH LYNCH, SIMON LYNCH and ERIC LYNCH, as a result of the trauma and emotional distress. Claims are being made for personal injuries, hospital, physician and other medical expenses, pain and suffering, loss of quality and/or enjoyment of life, loss of services companionship and society and all other damages to which claimants are entitled to by case law and statute.

        Said claims and demands are hereby presented for adjustment and payment. You are hereby notified that unless they are adjusted and paid within the time provided by law from the date of presentation to you, the claimants intend to commence an action in these claims. By reason of the foregoing, Claimants have been damaged in an amount which exceeds the jurisdictional limits of all lower courts which would otherwise have jurisdiction herein.

Dated:        Uniondale, New York
              January 26, 2007

The undersigned claimant(s) therefore present this claim for adjustment and payment. You are hereby notified that unless it is adjusted and paid within the time provided by law from the date of presentation to you, the claimant(s) intend(s) to commence an action on this claim.

Dated: Uniondale, New York

RICARDO LYNCH

## VERIFICATION

STATE OF NEW YORK     )
                              ) SS.:
COUNTY OF Nassau )

RICARDO LYNCH, being duly sworn, deposes and says that deponent is the above named claimant; deponent has read the foregoing NOTICE OF CLAIM and knows its contents; the same is true to deponent's knowledge, except as to those matters stated to be alleged upon information and belief, and as to those matters deponent believes it to be true.

Sworn to before me this
10 day of January, 2007

Notary Public

MELANIE LITTLE
NOTARY PUBLIC, State of New York
No. 02LI5002760
Qualified in Suffolk County
Commission Expires Oct. 5, 2010

DELL & LITTLE, LLP
Attorney for Claimant
1274 Reckson Plaza
Uniondale, New York 11556
(516) 512-7700

**EXHIBIT "C"**
**DOCKET NO. 08CV00080 & 08CV00083**
**AFFIDAVIT FOR A SEARCH WARRANT**

CITY COURT OF MOUNT VERNON
COUNTY OF WESTCHESTER
STATE OF NEW YORK
-----------------------------------------------------------------------------------------------X

**IN THE MATTER OF THE APPLICATION OF: P.O. Smith # 2085 of the Mt. Vernon Police Department**

**FOR A WARRANT OF SEARCH FOR THE PREMISES:**

**FOR A WARRANT OF SEARCH AND SEIZURE FOR THE FOLLOWING PERSONS and PREMISES**
**131 VISTA PL. 3RD FLOOR**
**58 SOUTH 14TH AVE**
**Name: "Ghetto"**
Hgt:5'8"
Build:  medium build
Complexion: medium

NAME: "J"
Hgt: 5'6"
Build: Medium
Complexion: Medium
And any individuals in the premises at time of warrant execution.
-----------------------------------------------------------------------------------------------X

CITY COURT OF MOUNT VERNON
COUNTY OF WESTCHESTER
STATE OF NEW YORK

**AFFIDAVIT FOR A SEARCH WARRANT**

   P.O. Smith #2085  being duly sworn, deposes and states; I am attempting to secure evidence of a violation of New York Penal Law, Section; 221.00/265.00

   I am a police officer employed by the Mount Vernon Police Department, Mount Vernon, New York, and I am making this affidavit in support of my application for a search warrant for the above captioned person and Premises. The allegations of fact set forth herein are based upon reliable information and Police Investigation. The sources of my information and basis of my beliefs are C.I. information.

   I am a Police Officer and have been for approximately three (3) years. I have been assigned to the Narcotics Unit for approx. 3 months. During my career I have been involved in over 150 narcotic related arrests. I have also participated in the execution of over 10 Search Warrants.

   On December 13,2006 in the evening hours the confidential informant who will be refereed to as 47983-06, was arrested on an unrelated charge. During a debriefing conducted by the intelligence unit, CI 47983-06 provided information of drug activity at locations that were currently under investigation by this department. which proved his reliability and credibility regarding illegal activity. CI  47983-06 further stated that a male known to him/her as "ghetto" described as a male black brown skinned with braided hair, sold marijuana to he/she on several occasions out of his third floor apartment located at 131 Vista Place. CI 47983-06 stated that the last time that he/she was in

"ghetto's" apartment, was on 12/06/2006. While in the apartment he/she observed "ghetto" with a loaded automatic handgun black in color with a wooden handle. The CI observed him put the gun on the kitchen counter above the kitchen sink. CI 47983-06 further stated while with "Ghetto" on 12/08/2006 in evening hours, the CI and "ghetto" went to 58 S 14th Ave to purchase marijuana. While in the premises CI 47983-06 stated that he/she bought thirty dollars worth of marijuana from a male black about 5'6" in height who goes by the name of "J". The CI stated while in the premises he/she observed two loaded handguns set on the living room coffee table. One of the handguns observed was described as being a silver revolver. The other firearm was described as black 45 semi automatic handgun. The CI continued to state that Ghetto is known to drive a gold Nissan Maxima 4 door. "Ghetto" was observed by the CI on several occasions selling marijuana from same said vehicle, and has also observed the handgun in said vehicle.

I am requesting that the Search Warrant be granted for the above descibed Premises, and the persons described above. I am also requesting that the Search Warrant include all persons who are found in said premises at the time of the execution of this Search Warrant due to the confidential source's information that at any given time there are a number of parties inside said premises processing narcotics and in possession of a firearm.

I am asking to confiscate any firearm, bullets and or marijuana in any form found along with paraphernalia found associated with the sale of marijuana including scales, cutting agents, packaging materials such as paper bundles, and plastic bags, scotch tape, measuring spoons, telephone pagers, cell phones, computers, computer disks, coin bags, balloons, rolling paper and U.S. Currency, and other paraphernalia found and associated with the use of cocaine including scissors and homemade pipes documentary evidence found of sales of illicit drugs, including lists of buyers and sellers, pay/owe sheets, IOU's, and price lists. And any and all items associated with firearms.

Indicia in the form of personal property including, identification, cancelled mail envelopes, photo's, keys, utility bills, all of which tend to prove the identity of the persons in possession of any of the above items that are found or which tend to prove the knowledge of such persons of the Contraband nature of the items found.

I am requesting that the Search Warrant be executable, at any time day or night without any prior notice due to the fact that the marijuana can easily be destroyed.

Based upon my experience as a narcotics investigator and my converstaions with the confidential source, as well as his ties with both of the suspects, it is my belief that the source's safety would be jeopardized if his identity were revealed, therefore it is requested that this affidavit remain sealed until further order of this court.

Based on the foregoing, there is probable cause to believe that a search of the captioned premises will reveal the presence of certain property, of kind and character described in Criminal Procedure Law, Section 690.10

To your deponent's knowledge, no similar application for the relief sought herein has

been made.

**COURT ENDORSEMENT:**

Sufficient proof having been given under oath that said property may be easily and quickly destroyed or disposed of; the executing officer is not required to give notice of his authority nor his purpose prior to executing the order. You are there fore commanded, at any time day or night, without first announcing your purpose or authority to make a search of the above listed premises, persons, for marijuana and firearms as described in PL. sections 221.00/265.00

Wherefore, it is respectfully requested that the Court issue a warrant and order of seizure in the annexed form authorizing the search of the:

PREMISES: 131 Vista Pl. 3rd floor
                58 S 14th Ave

Sworn to before me this 14th
December, 2006.

_____
City Judge-City of Mount Vernon
County of Westchester
State of New York

_____ #2085
Mount Vernon Police Department
Mount Vernon, New York

**EXHIBIT "D"**
**DOCKET NOS. 08CV00080 & 08CV00083**
**WARRANT ORDER**

CITY COURT OF MOUNT VERNON                          *ORDER*
COUNTY OF WESTCHESTER
STATE OF NEW YORK
-----------------------------------------------------------------------------------------X

IN THE MATTER OF THE APPLICATION OF Detective Christopher DiMase#168
FOR A WARRANT OF SEARCH AND SEIZURE FOR THE FOLLOWING PREMISES

58 S 14th Ave
Mount Vernon N.Y. 10550

FOR A WARRANT OF SEARCH AND SEIZURE FOR THE FOLLOWING PERSONS
   "J"
Male Black
Hgt: 5'6
Build: medium
Complexion: medium

And any individuals on the premises at the time of warrant execution.
-----------------------------------------------------------------------------------------X
IN THE NAME OF THE PEOPLE OF THE STATE OF NEW YORK
TO: ANY POLICE OFFICER OF THE MOUNT VERNON POLICE DEPARTMENT


        Proof by affidavit having been made before me this day by Detective Christopher DiMase#168
of the Mount Vernon Police Department, Mount Vernon, New York, that there is reasonable cause to believe
that certain property of a kind and character described in Criminal Procedure Law, Section 690.10.

        TO WIT: Property, which constitutes evidence and tends to demonstrate that an offense was
committed and that a particular person participated in the commission of an offense at 58 S 14th Ave Possession
of a Weapon and Marijuana.

        You are therefore commanded, at any time day or night, without first announcing your purpose
or authority to make a search of the above listed Premises, Person(s) for Weapons and Marijuana as described in
Penal Law Sections 220.00

        Paraphernalia found associated with the sale of Marijuana, including scales, cutting agents,
packaging materials such as paper bundles and plastic bags, scotch tape, measuring spoons, telephone pagers,
cell phones, computers, computer discs, video cameras, video tapes, coin bags, balloons, rolling paper and U.S.
Currency and other paraphernalia found in associated with the use of marijuana including scissors and
homemade pipes documentary evidence found of sales of illicit drugs, including list of buyers and sellers,
pay/owe sheets, IOU's, and price lists, and any and all items associated with firearms.

        Indicia found in the form of personal property including, identification, canceled mail
envelopes, photos, keys, utility bills, all which tend to prove the identity of the persons in possession of any of
the above items that are found or which tend to prove the knowledge of such persons of the contraband nature of
the items found.

        Any property seized pursuant to this warrant shall be returned without this warrant to the court
without unnecessary delay.

COURT ENDORSEMENT:

        Sufficient proof having been given under oath that said property may be easily and quickly
destroyed or disposed of; the executing officer is not required to give notice of his authority nor his
purpose prior to executing this order.

Dated 12/14 _____ 2006

City Judge, City of Mount Vernon
County of Westchester
State of New York

**EXHIBIT "E"**
**DOCKET NO. 08CV00080**
**JESSICA  LYNCH**
**50-H TRANSCIPT**

@COPY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - X
ELIZABETH LYNCH, SIMON LYNCH, ERIC LYNCH,
INFANTS, UNDER THE AGE OF 14, BY THEIR
MOTHER AND NATURAL GUARDIAN JESSICA LYNCH
AND JESSICA LYNCH INDIVIDUALLY AND
RICARDO LYNCH,

                    Plaintiffs,

                    -against-            08 CIV 00080

CITY OF MOUNT VERNON, THE MOUNT VERNON
POLICE DEPARTMENT AND POLICE OFFICERS
"JOHN DOE", "RICHARD DOE", FICTITIOUS
NAMES, TRUE NAMES UNKNOWN,

                    Defendants.
- - - - - - - - - - - - - - - - - - - - - X

HELD AT:        Mount Vernon City Hall
                One Roosevelt Square
                Mount Vernon, New York 10550
                January 14, 2008
                1:08 p.m.

          Examination before Trial of the

Plaintiff, JESSICA LYNCH, pursuant to Court

Order, held at the above time and place

before a Notary Public of the State of New

York.

          J & L REPORTING SERVICE
            of Westchester, Inc.
             200 East Post Road
        White Plains, New York 10601
              (914) 682-1888
            Lisa Dobbo, Reporter

2

A P P E A R A N C E S:


                    DELL & LITTLE, ESQUIRES
                    Attorneys for the Plaintiffs
                    Office & Post Office Address
                    1274 Reckson Place
                    Uniondale, New York 11556
                    BY:  STEPHANIE G. OVADIA,
                         ESQUIRE



                    CORPORATION COUNSEL
                    MOUNT VERNON
                    Attorneys for the Defendant
                    Office & Post Office Address
                    Mount Vernon City Hall
                    One Roosevelt Square
                    Mount Vernon, New York 10550
                    BY:  HINA SHERWANI, ESQUIRE



     A L S O    P R E S E N T:


                    Fabian McCalla

3

IT IS HEREBY STIPULATED AND AGREED, by and between the attorneys for the respective parties herein, that the sealing and filing of the within deposition be waived; that such deposition may be signed and sworn to before any officer authorized to administer an oath, with the same force and effect as if signed and sworn to before the officer before whom said deposition is taken.

IT IS FURTHER STIPULATED AND AGREED, that all objections, except as to form, are reserved to the time of trial.

1                              J. LYNCH                    4

2                         JESSICA LYNCH, residing at 58

3                         South 14th Avenue, Mount

4                         Vernon, New York 10550, having

5                         been duly sworn by Notary

6                         Public, Lisa Dobbo, testified

7                         as follows:

8          EXAMINATION BY MS. SHERWANI:

9                    Q.    Please state your full name for

10         the record.

11                   A.    Jessica Lynch.

12                   Q.    Please state your address for

13         the record.

14                   A.    58 South 14th Avenue, Mount

15         Vernon, New York 10550.

16                   Q.    Good afternoon, Ms. Lynch.

17                   A.    Good afternoon.

18                   Q.    My name is Hina Sherwani.  I'm

19         an attorney with the City of Mount Vernon.

20                   We're here to ask you some questions

21         about a claim that's been filed on your

22         behalf.

23                   If, at anytime, you don't understand

24         my question or you don't hear me, please let

25         me know and I'll ask you a different

J. LYNCH                              5

question or I'll ask it again.

    A.   Okay.

    Q.   Please use words in your
responses because our court reporter can't
take down nods and uh-huh's, so please just
use words.

    A.   Okay.

    Q.   If you need to take a break or
talk to your attorney so long as there's not
a question pending, we'll accommodate you so
just let me know.

    A.   Okay.

    Q.   How long have you lived at 58
South 14th?

    A.   About seven years.

    Q.   Describe 58 South 14th for me,
is it a single-family home, two-family, what
kind of residence is it?

    A.   More like a three-family.

    Q.   Is there an apartment in the
basement?

    A.   No, it's not really an
apartment.  It's two rooms in the basement.

             MS. OVADIA:  You're going to

```
 1                          J. LYNCH               6
 2              have to speak up because I can't hear
 3              you.
 4                   THE WITNESS:  Okay.
 5              Q.    What floor do you live on?
 6              A.    The basement.
 7                   MS. OVADIA:  Let me stop.
 8                   Are you asking at the time of
 9              the incident?
10              Q.    Yes, let's do at the time of
11         the incident and if that's changed, you can
12         let me know.
13              At the time of the incident, where
14         were you living?
15              A.    The basement.
16              Q.    How long have you been living
17         there?
18              A.    Seven years.
19              Q.    Do you still live in the
20         basement?
21              A.    No.
22              Q.    Now where do you live?
23              A.    Well, I moved to 70 Cornell in
24         Yonkers after the incident and I just came
25         back a week ago back to 58.
```

J. LYNCH                    7

    Q.    How long did you stay at 70

Cornell, approximately?

        A.    I left the end of this year.  I

moved there in May and I left in January of

this year.

    Q.    So, approximately six months

give or take?

        A.    Yes.

    Q.    70 Cornell, is there an

apartment number?

        A.    It's a private house.

    Q.    That's Yonkers?

        A.    Yes.

    Q.    I'm going to ask you some

questions about the date of the incident;

okay?

        A.    Okay.

    Q.    Who did you live with at 58

South 14th on the date of the incident?

        A.    My four children.

    Q.    What are their names and ages?

        A.    Ricardo Lynch.  At the time of

the incident, his age?

    Q.    Yes, that will be easier or if

```
 1                            J. LYNCH                    8
 2       you want to do right now.  It's up to you.
 3                 A.    Well, he's nineteen now.
 4                 Q.    Okay.
 5                 A.    Palcynth, P-A-L-C-Y-N-T-H
 6       Lynch.
 7                 Q.    That age?
 8                 A.    Oh, she's seventeen now.
 9                 Q.    Who else?
10                 A.    Simone Lynch.
11                 Q.    How old is Simone?
12                 A.    Twelve now, and then you have
13       Eric Lynch.  He's five now.
14                 Q.    You lived with your four
15       children in the basement?
16                 A.    Yes.
17                 Q.    Anyone else that lived in the
18       basement?
19                 A.    No, just me and my four
20       children.
21                 Q.    Do you know Mr. McCalla?
22                 A.    Yes.
23                 Q.    How do you know him?
24                 A.    That's my sister's fiance.
25                 Q.    Did your sister ever live with
```

1                          J. LYNCH                9

2       you in the basement?

3               A.    No.

4               Q.    Has Mr. McCalla ever lived with

5       you?

6               A.    No.

7               Q.    Who owns the property located

8       at 58 South 14th, if you know?

9               A.    Palcynth Hamilton and Joseph

10      Hamilton.

11              Q.    What the first name?

12              A.    Same as my daughter, Palcynth.

13              Q.    And Joseph?

14              A.    Yes.

15              Q.    How do you know them?

16              A.    They're my parents.

17              Q.    What is your sister's name?

18              A.    Which sister?

19              Q.    The sister that's the fiance of

20      Mr. McCalla.

21              A.    She go by Alethia.

22                    MR. McCALLA:  A-L-E-T-H-I-A.

23              Q.    I'm just going to refer to

24      Palcynth and Joseph as your parents; okay?

25              A.    Okay.

```
 1                            J. LYNCH            10
 2              Q.    On the date of the incident,
 3        where did they live?
 4              A.    At 58 South 14th Avenue.
 5              Q.    What part of the house?
 6              A.    The first floor.
 7              Q.    Did any part of the Mount
 8        Vernon Police Department activity occur on
 9        the first floor?
10              A.    Yes.
11              Q.    Can you describe that for me?
12              A.    I was not on the first floor.
13              Q.    Did you see any of it?
14              A.    No, but it occurred through the
15        whole house.
16              Q.    Were you ever on the first
17        floor when you witnessed any of the
18        officers?
19              A.    No, they kept everybody in
20        their own section.
21              Q.    Were your parents home at the
22        time?
23              A.    My mother was at work.  My
24        father was home.
25              Q.    You described Mr. McCalla as
```

```
1                           J. LYNCH           11
2      living on the second floor?
3              A.    Yes.
4              Q.    Does anyone else live on the
5      second floor?
6              A.    My sister that's with him and
7      their four children.
8              Q.    Is there a third floor?
9              A.    No.
10             Q.    Is there anyone else that lives
11     at 58 South 14th that we haven't talked
12     about?
13             A.    Well, my sister, my sister
14     Karina is there with her two little ones on
15     the second floor.
16             Q.    Was she there on the date of
17     the incident?
18             A.    Yes.
19             Q.    Do you work?
20             A.    Yes, I do.
21             Q.    Where do you work?
22             A.    I work at the Wartburg Nursing
23     Home in Mount Vernon.
24             Q.    What is your position at
25     Wartburg?
```

```
1                           J. LYNCH              12
2           A.     Environmental aide.
3           Q.     What does that mean?
4           A.     Housekeeping.  They call it
5      environmental aide.
6           Q.     What are your hours?
7           A.     8:00 to 4:00.
8           Q.     Five days a week?
9           A.     Yes.
10          Q.     Do you do overtime?
11          A.     No.
12          Q.     What time did the occurrence
13     take place that we're here to talk about?
14          A.     Took place around 5:00 in the
15     morning.
16          Q.     Were you home the night -- that
17     night --
18          A.     Yes, I was.
19          Q.     -- leading up to 5:00 a.m.?
20          A.     Yes, I was.
21          Q.     At approximately 5:00 a.m.,
22     what were you doing?
23          A.     Sleeping.
24          Q.     Tell me how you woke up.
25          A.     I heard like a running sound
```

```
1                              J. LYNCH           13
2        and I heard like something came tumbling
3        down the stairs and at the time I reached
4        there I saw the whole door coming in.
5             Q.    Then what happened?
6             A.    The gun was blazing on all over
7        the place.
8             Q.    Can you describe what do you
9        mean by that?
10            A.    They draw the guns and they had
11       the guns out on me and my children.
12            Q.    When you say they, who are you
13       referring to?
14            A.    The officers of Mount Vernon.
15            Q.    How many officers were there
16       when you first saw them?
17            A.    I think around -- there was
18       around five or six in my section.
19            Q.    What were they saying?
20            A.    That's the point.  They were
21       not talking.
22            Q.    Tell me what else, if anything,
23       they did next?
24            A.    Well, they had the gun out,
25       they handcuffed my son and put him on the
```

```
 1                          J. LYNCH              14
 2       cold floor.
 3               Q.     Which son are you referring to?
 4               A.     My oldest son.
 5               Q.     Ricardo?
 6               A.     Yes.
 7               Q.     So, they handcuffed Ricardo?
 8               A.     Yes.
 9               Q.     Did they handcuff you?
10               A.     No.
11               Q.     Did they handcuff any of the
12       other children?
13               A.     No, but they was telling them
14       to get down on the floor.
15               Q.     Did they comply, did the kids
16       do that, did the kids get on the floor?
17               A.     No.
18               Q.     What happened?
19               A.     Because I told them not to.
20               Q.     What did they do?
21               A.     They just got -- pulled the gun
22       and my son at the time that's five was four
23       coming out of the room the officer had the
24       gun and my daughter had to say -- screaming
25       "My little brother is coming out."
```

```
 1                        J. LYNCH            15
 2              Q.    What did the other kids do?
 3              A.    They sat there shaking.  My
 4        twelve year old almost passed out.
 5                    MS. SHERWANI:  I'm just going
 6                 to have the reporter mark these.
 7                    (Whereupon, Defendant's Exhibit
 8                 A-D, photocopies of photographs, were
 9                 marked for Identification.)
10              Q.    I'm going to show you what
11        we've marked as Defendant's B of today's
12        date.
13                         (Handed)
14              Q.    Can you describe for me what
15        that picture shows?
16                    MS. OVADIA:  I'm going to ask
17                 that I get copies of the pictures,
18                 please.
19                    MS. SHERWANI:  Sure.
20              A.    I see like my brother's on the
21        ground.
22                    MS. OVADIA:  Are you asking in
23                 general what that picture is?
24                    Could you be a little more
25                 specific?
```

```
1                             J. LYNCH            16
2              Q.    Can you tell me if that's the
3         basement apartment?
4              A.    None of these is not my
5         section.  I don't see any of my pictures.
6              Q.    This is not the basement?
7              A.    No.
8              Q.    Have you ever been on the first
9         floor of 58 South 14th?
10             A.    Yes.
11             Q.    Does that show the first floor?
12             A.    If this is the first floor?
13             Q.    Yes.
14             A.    Yes, this is the first floor.
15             Q.    Do you know the person who is
16        shown in the picture?
17             A.    Yes, that's my younger brother.
18             Q.    What is his name?
19             A.    His name is Dwight Hamilton.
20             Q.    Does Dwight live with your
21        parents on the first floor?
22             A.    At the time, yes.  At the time
23        of the incident, yes.
24             Q.    How old was he at the time, if
25        you know?
```

```
 1                        J. LYNCH              17
 2              A.    I have no idea.  I don't
 3        recall.
 4              Q.    You don't know?
 5              A.    No, I don't recall, no.
 6              Q.    Is he older than you?
 7              A.    He's younger.
 8              Q.    I'm going to show you what
 9        we've marked as Defendant's A for today's
10        date.
11                        (Handed)
12              Q.    Do you recognize that picture?
13              A.    Yes.
14              Q.    What floor is that of?
15              A.    That's the second floor.
16              Q.    There is a close circuit TV
17        depicted in the picture.
18              Do you have one of those in the
19        basement?
20              A.    No.
21              Q.    Is there one on the first
22        floor?
23              A.    No.
24              Q.    How long, if you know, how long
25        have your parents owned 58 South 14th?
```

```
 1                           J. LYNCH            18
 2              A.    From when I was a child.
 3              Q.    I'm going to show you
 4      Defendant's C.
 5                    (Handed)
 6              Q.    Does Defendant's C show the
 7      basement?
 8              A.    No.
 9              Q.    Is that the first floor?
10              A.    No, that's the second floor.
11              Q.    Do you recognize any of the
12      people in that picture?
13              A.    Yes.
14              Q.    Who is that?
15              A.    That's Fabian McCalla my nephew
16      Jahmarcus.
17              Q.    And the young lady?
18              A.    That's my sister.
19              Q.    That's the individual in the
20      middle?
21              A.    Yes.
22              Q.    What is her name?
23              A.    Karina Hamilton.
24              Q.    She's holding someone in her
25      lap?
```

```
1                            J. LYNCH              19
2              A.    That's her daughter.
3              Q.    What is her name?
4              A.    Jacqueline.
5              Q.    There's an individual standing
6         to the right --
7              A.    I have no idea who that person
8         is.  I can't see the face.
9              Q.    But, again, this is the second
10        floor?
11             A.    Yes.
12             Q.    So far we have a picture of the
13        first floor in which your brother was?
14             A.    Right, correct.
15             Q.    Which is Defendant's B?
16             A.    Yes.
17             Q.    Then two pictures of the second
18        floor?
19             A.    Yes.
20             Q.    Defendants A and Defendant's C?
21             A.    Yes.
22             Q.    I'm going to show you
23        Defendant's D.
24                        (Handed)
25             Q.    What floor does that show?
```

```
 1                              J. LYNCH              20
 2              A.    The first floor.
 3              Q.    Who's in that photograph?
 4              MS. OVADIA:   If you know.
 5              A.    My nephew, Duane, Jamie and
 6        Sayed.
 7              Q.    Duane, Jamie and Sayed, can you
 8        tell me whose children --
 9              A.    My other sister's children.
10              Q.    Which one?
11              A.    Norette Smith.
12              Q.    Where did Norette live at the
13        time?
14              A.    She was staying on the second
15        floor -- sorry, first floor.
16              Q.    How many children does Norette
17        have?
18              A.    She have five.
19              Q.    So, on the date of the
20        incident, on the first floor were your
21        parents, your younger brother, Norette
22        Smith, your sister and her five children?
23              A.    Yes.
24              Q.    Anyone else on the first floor?
25              A.    My uncle was there at the time.
```

```
 1                            J. LYNCH          21
 2             Q.    What is his name?
 3             A.    Clarence Gordon.
 4             Q.    Does he still live with you --
 5       not with you but does he live in the house?
 6             A.    Yes.
 7             Q.    Anyone else that lived on the
 8       first floor at the time?
 9             A.    No.
10             Q.    How about anyone else that
11       lived with you at the time?
12             A.    Just me and my four children in
13       the basement.
14             Q.    Anyone else that lived with you
15       in the year before the incident?
16             A.    No.
17             Q.    How about on the first floor,
18       did anyone else live on the first floor in
19       the year before the incident that may have
20       left a few months before?
21             A.    No.
22             Q.    How about on the second floor?
23             A.    No.
24             Q.    Now, you described that the
25       officers had their guns drawn, there were
```

```
 1                              J. LYNCH            22
 2          about five or six officers?
 3                  A.    Correct.
 4                  Q.    They told your children to get
 5          on the floor?
 6                  A.    Correct.
 7                  Q.    But they didn't because it was
 8          cold?
 9                  A.    Correct.
10                  Q.    What happened next?
11                  A.    They just started ransacking my
12          whole place.
13                  Q.    Describe that for me.
14                  A.    They broke the whole door off,
15          they broke my bed down, they threw
16          everything out of my drawers, everything.
17                  Q.    How many drawers, approximately
18          are we talking about?
19                  A.    Six.  It's a big dresser, six
20          drawers.
21                  Q.    Did they say anything to you?
22                  A.    They were not talking.
23                  Q.    What else did they do?
24                  A.    They was just ransacking the
25          whole place and had the gun at all time on
```

J. LYNCH                    23

1
2      me and my children.
3             Q.    When you say they broke the
4      bed, what do you mean?
5             A.    They broke the bed.  I couldn't
6      -- like I told you, I just left out of the
7      place.  I couldn't sleep there no more.
8             Q.    During the incident, you
9      stayed, right, when the officers were there?
10            A.    Yes.
11            Q.    How long were the officers in
12     the apartment?
13            A.    I think they was there till --
14     I'm not sure -- close to around going to
15     12:00 or 1:00.
16            Q.    Just your specific area,
17     meaning the basement of the home?
18                  MS. OVADIA:  If you know.
19            A.    I'm not quite sure of the exact
20     time.
21            Q.    Were they there more than an
22     hour?
23            A.    Was more than an hour.
24            Q.    During that hour, what were you
25     doing?

J. LYNCH                        24

1

2          A.    We couldn't do anything because

3     gun was appointed at us and right over my

4     son's head.

5          Q.    That's Ricardo?

6          A.    Yes.

7          Q.    What else did they do besides

8     empty out the six drawers and break the bed?

9          A.    They practically went through

10    everything in the basement.  They went

11    through everything.

12         Q.    It's two rooms?

13         A.    Yes, two very large rooms.

14         Q.    Is there a bathroom?

15         A.    No.

16         Q.    Is there a kitchen?

17         A.    No.

18         Q.    Describe the set up for me,

19    what each of the rooms had.

20         A.    It's a room that my children

21    was in.  They had their computer, TV, radio.

22              MS. OVADIA:  You're asking

23         about furniture or electronics, or

24         what exactly?

25              MS. SHERWANI:  Anything she can

```
 1                          J. LYNCH              25
 2              describe.
 3                    MS. OVADIA:  Anything that was
 4              in the room?
 5                    MS. SHERWANI:  Yes.
 6              A.    Like I said, computer, TV,
 7       radio and two beds, their closet and
 8       dressers.
 9              Q.    How many dressers?
10              A.    Two.
11              Q.    How many drawers each?
12              A.    I think it was six on one and I
13       think five on the other one if I'm not
14       mistaken.
15              Q.    And the room that you just
16       described, is there one way to get into that
17       room or more than one?
18              A.    It's more than one.  It's two
19       entrances.
20              Q.    Describe for me each of the
21       entrances, how you can get into that room.
22              A.    One you can walk through the
23       first floor apartment where my parents used
24       to come down and there's another entrance in
25       the back.
```

```
1                           J. LYNCH              26
2              Q.    The entrance in the back, does
3         that go outside?
4              A.    Yes.
5              Q.    Is there a storm door and
6         regular door or just one door?
7              A.    One door -- it's two doors,
8         actually; one that you enter to come down
9         and one that leads to my bedroom.
10             Q.    So, the room that you just
11        described is basically the kids' room?
12             A.    Yes, it is.
13             Q.    Now, describe the other
14        bedroom.
15             A.    The other bedroom was mines.
16        It had, like I told you, the big dresser
17        with the six drawers and the TV and a radio,
18        the bed, the closet and a chair.
19             Q.    Is there a hallway or anything
20        like that downstairs?
21             A.    Yes.   When you come down the
22        step where the officers came down there's a
23        hallway down there.
24             Q.    Was there any furniture in the
25        hallway?
```

```
 1                          J. LYNCH              27
 2              A.    No.
 3              Q.    Were you ever handcuffed during
 4        this incident?
 5              A.    No.
 6              Q.    What, if anything, did you say
 7        to the officers?
 8              A.    What did I say to the officers?
 9        I asked them what's going on but no one was
10        speaking.
11              Q.    Anything else?
12              A.    No.
13              Q.    Did you ever curse at them?
14              A.    No, I did not.
15              Q.    Did they ever curse at you?
16              A.    No, they did not.
17              Q.    Did they ever physically touch
18        you in any way?
19              A.    No, they did not.
20              Q.    Did there come a time that you
21        left the apartment?
22              A.    No, I did not.
23              Q.    Did the officers leave the
24        apartment?
25              A.    No, only one had left and
```

1                           J. LYNCH            28

2          another one came in after he went up.

3                   Q.    How did the situation resolve

4          or how did it end?

5                   A.    Could you explain?

6                   MS. OVADIA:   You're asking what

7                   point did they leave?

8                   Q.    When did they leave?

9                   A.    I don't recall the exact time

10         they walked out.

11                  Q.    But there did come a time when

12         they left?

13                  A.    Yes, they did.

14                  Q.    How did they leave or where did

15         they go?

16                  A.    They just walked out.  That's

17         it.

18                  Q.    They walked to the outside or

19         they walked up --

20                  A.    They went up to the first floor

21         and went outside.

22                  Q.    Now, before that happened, did

23         anyone from the rest of the house come down

24         to see what was going on?

25                  A.    After the officers had left.

```
 1                              J. LYNCH              ·        29
 2                 Q.    But not before?
 3                 A.    They did not allow anyone to
 4        move.
 5                 Q.    So, were there officers, as far
 6        as you know, that had gone to the first
 7        floor and second floor?
 8                 A.    No, each floor has officers so
 9        no one was allowed to move.
10                 Q.    Separate officers?
11                 A.    Yes.
12                 Q.    Did you ever go to court as a
13        result of this incident?
14                 A.    No, I did not.
15                 Q.    Did you ever go to the police
16        station as a result of the incident?
17                 A.    Yes, I went to the police
18        station after they had left.
19                 Q.    What happened there?
20                 A.    Nobody said anything.
21                 Q.    What did you say when you
22        arrived?
23                 A.    I think -- I'm not sure, but I
24        think I told them that officers just came
25        where I live and I need to know what's going
```

```
 1                              J. LYNCH              30
 2        on.   The officer that I spoke to, just like
 3        the rest, did not answer.
 4               Q.    In the year before this
 5        incident, did you, at anytime, notice a lot
 6        of cars coming and going to the house that
 7        you hadn't noticed before?
 8               A.    No.
 9               Q.    In the year before the
10        incident, did you ever notice individuals
11        coming in and out of the house that did not
12        do that before?
13               A.    No.
14               Q.    Besides your oldest son being
15        handcuffed, were any of the other children
16        handcuffed?
17               A.    No, they were not.
18               Q.    Were they touched by the
19        officers in any way?
20               A.    No, they were not.
21               Q.    The older son, were his
22        handcuffs removed?
23               A.    The handcuffs was removed and
24        put on by an officer that I've known and she
25        put on another one, a plastic one, I think.
```

1                                    J. LYNCH                        31

2              Q.    Did he ever seek any medical

3       treatment after this incident?

4              A.    No.

5                    MS. SHERWANI:  I have nothing

6              further of this witness.

7                    (Whereupon this examination

8              concluded at 1:40 p.m.)

9

10

11                                  _____

12                                  JESSICA LYNCH

13      Subscribed and sworn to

14      before me this_____day

15      of_____, 2008.

16

17      _____

18            Notary Public

19

20

21

22

23

24

25

32

C E R T I F I C A T E


STATE OF NEW YORK     )
                      )ss.:
COUNTY OF WESTCHESTER)


       I, LISA DOBBO, a Shorthand
Reporter and Notary Public within and for
the State of New York, do hereby certify:


       That JESSICA LYNCH, the witness
whose deposition is hereinbefore set forth,
was duly sworn by me, and that such
deposition is a true record of the testimony
given by the witness.


       I further certify that I am not
related to any of the parties to this action
by blood or marriage, and that I am in no
way interested in the outcome of this
matter.


       IN WITNESS WHEREOF, I have
hereunto set my hand this 16th day of
January, 2008.


                    _____
                    LISA DOBBO
                    SHORTHAND REPORTER

33

DEFENDANT'S EXHIBITS

No.       Description                    Page

A-D       Photocopies of                 15
          photograghs

34

### ERRATA SHEET

The following corrections, additions or deletions were noted on the transcript of the testimony which I gave in the above-captioned matter held on 1/14/08:


Page____Line____SHOULD READ:_____

REASON FOR CHANGE:_____

Page____Line____SHOULD READ:_____

REASON FOR CHANGE:_____

Page____Line____SHOULD READ:_____

REASON FOR CHANGE:_____

Page____Line____SHOULD READ:_____

REASON FOR CHANGE:_____

Page____Line____SHOULD READ:_____

REASON FOR CHANGE:_____

Page____Line____SHOULD READ:_____

REASON FOR CHANGE:_____

Page____Line____SHOULD READ:_____

REASON FOR CHANGE:_____


_____
JESSICA LYNCH

Subscribed and sworn to
before me this_____day
of_____, 2008.


_____
    Notary Public

35

## 0

00080 - 1:7
08 - 1:7

## 1

1/14/08 - 34:4
10550 - 1:13; 2:13; 4:4, 15
10601 - 1:24
11556 - 2:6
1274 - 2:6
12:00 - 23:15
14 - 14, 14
14th - 4:3, 14; 5:15, 17; 7:20;
  9:8; 10:4; 11:11; 16:9; 17:25
15 - 33:7
16th - 32:17
1:00 - 23:15
1:08 - 1:14
1:40 - 31:8

## 2

200 - 1:24
2008 - 1:14; 31:15; 32:17;
  34:23

## 4

4:00 - 12:7

## 5

58 - 4:2, 14; 5:14, 17; 6:25;
  7:19; 9:8; 10:4; 11:11; 16:9;
  17:25
5:00 - 12:14, 19, 21

## 6

682-1888 - 1:25

## 7

70 - 6:23; 7:2, 10

## 8

8:00 - 12:7

## 9

914 - 1:25

## A

A-L-E-T-H-I-A - 9:22
a.m - 12:19, 21
above-captioned - 34:4
accommodate - 5:11
action - 32:13
activity - 10:8
AD - 15:8; 33:7
additions - 34:3
Address - 2:5, 11
address - 4:12
administer - 3:11

afternoon - 4:16
AGE - 1:4
age - 7:24; 8:7
ages - 7:22
ago - 6:25
AGREED - 3:6, 17
aide - 12:2, 5
Alethia - 9:21
allow - 29:3
allowed - 29:9
almost - 15:4
AND - 1:7
answer - 30:3
anytime - 4:23; 30:5
apartment - 5:21, 24; 7:11;
  16:3; 23:12; 25:23; 27:21, 24
appointed - 24:3
area - 23:16
arrived - 29:22
AT - 1:12
attorney - 4:19; 5:10
Attorneys - 2:5, 11
attorneys - 3:6
authorized - 3:10
Avenue - 4:3, 14; 10:4

## B

basement - 5:22, 24; 6:6, 15,
  20; 8:15, 18; 9:2; 16:3, 6;
  17:19; 18:7; 21:13; 23:17;
  24:10
bathroom - 24:14
bed - 22:15; 23:4; 24:8; 26:18
bedroom - 26:9, 14
beds - 25:7
behalf - 4:22
between - 3:6
big - 22:19; 26:16
blazing - 13:6
blood - 32:14
break - 5:9; 24:8
broke - 22:14; 23:3, 5
brother - 14:25; 16:17; 19:13;
  20:21
brother's - 15:20
BY - 1:4; 2:7, 13; 4:8

## C

captioned - 34:4
cars - 30:6
certify - 32:8, 13
chair - 26:18
CHANGE - 34:7, 9, 11, 13, 15,
  17, 19
changed - 6:11
child - 18:2
children - 7:21; 8:15, 20; 11:7;
  13:11; 14:12; 20:8, 16, 22;
  21:12; 22:4; 23:2, 24:20;
  30:15
circuit - 17:16
CITY - 1:8
City - 1:12; 2:12; 4:19
CIV - 1:7
claim - 4:21
Clarence - 21:3
close - 17:16; 23:14
closet - 25:7; 26:18
cold - 14:2; 22:8
coming - 13:4; 14:23, 25; 30:6,
  11
comply - 14:15
computer - 24:21; 25:6

concluded - 31:8
copies - 15:17
Cornell - 6:23; 7:3, 10
CORPORATION - 2:10
Correct - 22:3; 6, 9
correct - 19:14
corrections - 34:3
COUNSEL - 2:10
COUNTY - 32:5
court - 5:5; 29:12
Court - 1:17
COURT - 1:7
curse - 27:13, 15

## D

date - 7:16, 20; 10:2; 11:16;
  15:12; 17:10; 20:19
daughter - 9:12; 14:24; 19:2
days - 12:8
Defendant - 2:11
Defendants - 15:7, 11; 17:9;
  18:4, 6; 19:15, 20, 23
DEFENDANTS - 33:4
Defendants - 1:11; 19:20
deletions - 34:3
DELL - 2:4
Department - 10:8
DEPARTMENT - 1:9
depicted - 17:17
deposition - 3:8, 13; 32:10
Describe - 5:17; 22:13; 24:18;
  25:20
describe - 10:11; 13:8; 15:14;
  25:2; 26:13
described - 10:25; 21:24;
  25:16; 26:11
Description - 33:5
different - 4:25
DISTRICT - 1:2
Dobbo - 1:25; 4:6
DOBBO - 32:7. 21
DOE - 1:9
door - 13:4; 22:14; 26:5
doors - 26:7
down - 6:16; 13:3; 14:14; 22:15;
  25:24; 26:8, 21-23; 28:23
downstairs - 26:20
draw - 13:10
drawers - 22:16, 20; 24:8;
  25:11; 26:17
drawn - 21:25
dresser - 22:19; 26:16
dressers - 25:8
Duane - 20:5, 7
duly - 4:5; 32:10
During - 23:8, 24
during - 27:3
Dwight - 16:19

## E

easier - 7:25
East - 1:24
effect - 3:12
electronics - 24:23
ELIZABETH - 1:3
empty - 24:8
end - 7:4; 28:4
enter - 26:8
entrance - 25:24; 26:2
entrances - 25:19, 21
Environmental - 12:2
environmental - 12:5
ERIC - 1:3

Eric - 8:13
ERRATA - 34:2
ESQUIRE - 2:7, 13
ESQUIRES - 2:4
exact - 23:19; 28:9
exactly - 24:24
Examination - 1:16
examination - 31:7
EXAMINATION - 4:8
except - 3:17
Exhibit - 15:7
EXHIBITS - 33:4
explain - 28:5

## F

Fabian - 2:17; 18:15
face - 19:8
family - 5:18, 20
far - 19:12; 29:5
father - 10:24
few - 21:20
fiance - 8:24; 9:19
FICTITIOUS - 1:9
filed - 4:21
filing - 3:8
first - 9:11; 10:6, 9, 12, 16;
  13:16; 16:8, 11-12, 14, 21;
  17:21; 18:9; 19:13; 20:2, 15,
  20, 24; 21:8, 17-18; 25:23;
  28:20; 29:6
Five - 12:8
five - 8:13; 13:18; 14:22; 20:18,
  22; 22:2; 25:13
floor - 6:5; 10:6, 9, 12, 17; 11:2,
  5, 8, 15; 14:2, 14, 16; 16:9,
  11-12, 14, 21; 17:14, 22; 18:9;
  19:10, 13, 18, 25; 20:2, 15,
  20, 24; 21:8, 17-18, 22; 22:5;
  25:23; 28:20; 29:7
following - 34:3
follows - 4:7
FOR - 34:7, 9, 11, 13, 15, 17, 19
force - 3:11
form - 3:18
forth - 32:10
four - 7:21; 8:14, 19; 11:7;
  14:22; 21:12
full - 4:9
furniture - 24:23; 26:24
FURTHER - 3:16

## G

general - 15:23
given - 32:11
Gordon - 21:3
ground - 15:21
GUARDIAN - 1:4
gun - 13:6, 24; 14:21, 24;
  22:25; 24:3
guns - 13:10; 21:25

## H

Hall - 1:12; 2:12
hallway - 26:19, 23, 25
Hamilton - 9:9; 16:19; 18:23
hand - 32:17
handcuff - 14:9, 11
handcuffed - 13:25; 14:7;
  27:3; 30:15
handcuffs - 30:22
Handed - 15:13; 17:11; 18:5;
  19:24

head - 24:4
hear - 4:24; 6:2
heard - 12:25; 13:2
held - 1:18; 34:4
HELD - 1:12
hereby - 32:8
HEREBY - 3:5
herein - 3:7
hereinbefore - 32:10
hereunto - 32:17
Hina - 4:18
HINA - 2:13
holding - 18:24
Home - 11:23
home - 5:18; 10:21, 24; 12:16;
  23:17
hour - 23:22
hours - 12:6
house - 7:12; 10:5, 15; 21:5;
  28:23; 30:6, 11
Housekeeping - 12:4
huh's - 5:6

## I

idea - 17:2; 19:7
Identification - 15:9
IN - 32:16
Inc - 1:23
incident - 6:9, 11, 13, 24; 7:16,
  20, 24; 10:2; 11:17; 16:23;
  20:20; 21:15, 19; 23:8; 27:4;
  29:13, 16; 30:5, 10; 31:3
individual - 18:19; 19:5
INDIVIDUALLY - 1:5
individuals - 30:10
INFANTS - 1:4
interested - 32:14
IS - 3:5, 16
IT - 3:5, 16

## J

Jacqueline - 19:4
Jahmarcus - 18:16
Jamie - 20:5, 7
January - 1:14; 7:5; 32:17
Jessica - 4:11
JESSICA - 1:4, 17; 4:2; 31:11;
  32:9; 34:21
JOHN - 1:9
Joseph - 9:9, 13, 24

## K

Karina - 11:14; 18:23
kept - 10:19
kids - 14:15; 15:2
kids' - 26:11
kind - 5:19
kitchen - 24:16
known - 30:24

## L

lady - 18:17
lap - 18:25
large - 24:13
leading - 12:19
leads - 26:9
leave - 27:23; 28:7, 14
left - 7:4; 21:20; 23:6; 27:21, 25;
  28:12, 25; 29:18

LISA- 32:7, 21
Lisa- 1:25; 4:6
LITTLE- 2:4
live - 6:5, 19, 22; 7:19; 8:25;
  10:3; 11:4; 16:20; 20:12; 21:4,
  18; 29:25
lived - 5:14; 8:14, 17; 9:4; 21:7,
  11, 14
lives - 11:10
living - 6:14, 16; 11:2
located - 9:7
LYNCH- 1:3-5, 17; 4:2; 31:11;
  32:9; 34:21
Lynch- 4:11, 16; 7:23; 8:6, 10,
  13

**M**

mark - 15:6
marked - 15:9, 11; 17:9
marriage - 32:14
matter - 32:15; 34:4
McCalla - 2:17; 8:21; 9:4, 20,
  22; 10:25; 18:15
mean - 12:3; 13:9; 23:4
meaning - 23:17
medical - 31:2
middle - 18:20
mines - 26:15
mistaken - 25:14
months - 7:7; 21:20
morning - 12:15
MOTHER - 1:4
mother - 10:23
MOUNT - 1:8; 2:10
Mount - 1:12; 2:12; 4:3, 14, 19;
  10:7; 11:23; 13:14
move - 29:4, 9
moved - 6:23; 7:5
MR - 9:22
MS - 4:8; 5:25; 6:7; 15:5, 16,
  19, 22; 20:4; 23:18; 24:22; 25;
  25:3, 5; 28:6; 31:5

**N**

name - 4:9, 18; 9:11, 17; 16:18;
  18:22; 19:3; 21:2
names - 7:22
NAMES- 1:10
NATURAL- 1:4
need - 5:9; 29:25
nephew - 18:15; 20:5
NEW- 1:2; 32:4
New- 1:13, 19, 24; 2:6, 13; 4:4,
  15; 32:8
next - 13:23; 22:10
night - 12:16
nineteen - 8:3
Nobody- 29:20
None- 16:4
Norette- 20:11, 16, 21
Notary- 1:19; 4:5; 31:17; 32:7;
  34:24
noted - 34:3
nothing - 31:5
notice - 30:5, 10
noticed - 30:7
number - 7:11
Nursing- 11:22

**O**

oath - 3:11
objections - 3:17

occur - 10:8
occurred - 10:14
occurrence - 12:12
OF- 1:2, 4, 8; 32:4
Office- 2:5, 11
officer - 3:10, 13; 14:23; 30:2,
  12
OFFICERS- 1:9
officers - 10:18; 13:14; 21:25;
  22:2; 23:9, 11; 26:22; 27:7,
  23; 28:25; 29:5, 8, 10, 24;
  30:19
old - 8:11; 15:4; 16:24
older - 17:8; 30:21
oldest - 14:4; 30:14
one - 17:18, 21; 20:10; 25:12,
  16-18; 26:8; 8-9; 27:9, 25;
  28:2; 29:9; 30:25
One- 1:13; 2:12; 25:22; 26:7
ones - 11:14
Order- 1:18
outcome - 32:14
outside - 26:3; 26:18, 21
OVADIA- 2:7; 5:25; 6:7; 15:16,
  22; 20:4; 23:18; 24:22; 25:3;
  28:6
overtime - 12:10
own - 10:20
owned - 17:25
owns - 9:7

**P**

p.m - 1:14; 31:8
Page- 33:5
Page____Line____
  SHOULD - 34:6, 8, 10, 12,
  14, 16, 18
Palcynth- 8:5; 9:9, 12, 24
PALCYNTH- 8:5
parents - 9:16, 24; 10:21;
  16:21; 17:25; 20:21; 25:23
part - 10:5, 7
parties - 3:7; 32:13
passed - 15:4
pending - 5:11
people - 18:12
person - 16:15; 19:7
Photocopies - 33:7
photocopies - 15:8
photographs - 33:7
photograph - 20:3
photographs - 15:8
physically - 27:17
picture - 15:15, 23; 16:16;
  17:12, 17; 18:12; 19:12
pictures - 15:17; 16:5; 19:17
place - 1:18; 12:13; 13:7;
  22:12, 25; 23:7
Place- 2:6
Plains - 1:24
Plaintiff - 1:17
Plaintiffs - 1:6; 2:5
plastic - 30:25
point - 13:20; 28:7
Police- 10:8
POLICE- 1:9
police - 29:15, 17
Post- 1:24; 2:5, 11
practically - 24:9
private - 7:12
property - 9:7
Public- 1:19; 4:6; 31:17; 32:7;
  34:24
pulled - 14:21
pursuant - 1:17

put - 13:25; 30:24

**Q**

questions - 4:20; 7:16
quite - 23:19

**R**

radio - 24:21; 25:7; 26:17
ransacking - 22:11, 24
reached - 13:3
READ- 34:6, 8, 10, 12, 14, 16,
  18
really - 5:23
REASON- 34:7, 9, 11, 13, 15,
  17, 19
Reckson- 2:6
recognize - 17:12; 18:11
record - 4:10, 13; 32:11
refer - 9:23
referring - 13:13; 14:3
regular - 26:6
related - 32:13
removed - 30:22
REPORTER- 32:22
Reporter- 1:25; 32:7
reporter - 5:5; 15:6
REPORTING - 1:23
reserved - 3:18
residence - 5:19
residing - 4:2
resolve - 28:3
respective - 3:7
responses - 5:5
rest - 28:23; 30:3
result - 29:13, 16
RICARDO- 1:5
Ricardo- 7:23; 14:5, 7; 24:5
RICHARD- 1:9
Road - 1:24
room - 14:23; 24:20; 25:4, 15,
  17, 21; 26:10
rooms - 5:24; 24:12, 19
Roosevelt- 1:13; 2:12
running - 12:25

**S**

sat - 15:3
saw - 13:4, 16
Sayed- 20:6
screaming - 14:24
sealing - 3:7
second - 11:2, 5, 15; 17:15;
  18:10; 19:9, 17; 20:14; 21:22;
  29:7
section - 10:20; 13:18; 16:5
see - 10:13; 15:20; 16:5; 19:8;
  28:24
seek - 31:2
Separate- 29:10
SERVICE- 1:23
set - 24:18; 32:10, 17
Seven- 6:18
seven - 5:16
seventeen - 8:8
shaking - 15:5
SHEET- 34:2
SHERWANI- 2:13; 4:8; 15:5,
  19; 24:25; 25:5; 31:5
Sherwani- 4:18
Shorthand- 32:7
SHORTHAND- 32:22

show - 15:10; 16:11; 17:8; 18:3,
  6; 19:22, 25
shown - 16:16
shows - 15:15
signed - 3:9, 12
SIMON- 1:3
Simone- 8:10
single - 5:18
single-family - 5:18
sister - 8:25; 9:18; 11:6, 13;
  18:18; 20:22
sister's - 8:24; 9:17; 20:9
situation - 28:3
Six- 32:19
six - 7:7; 13:18; 22:2, 19; 24:8;
  25:12; 26:17
sleep - 23:7
Sleeping- 12:23
Smith- 20:11, 22
someone - 18:24
son - 13:25; 14:3, 22; 30:14, 21
son's - 24:4
sorry - 20:15
sound - 12:25
South- 4:3, 14; 5:15, 17; 7:20;
  9:8; 10:4; 11:11; 16:9; 17:25
SOUTHERN- 1:2
speaking - 27:10
specific - 15:25; 23:16
Square- 1:13; 2:12
ss - 32:4
stairs - 13:3
standing - 19:5
started - 22:11
state - 4:9, 12
STATE- 32:4
State- 1:19; 32:8
STATES- 1:2
station - 29:16, 18
stay - 7:2
stayed - 23:9
staying - 20:14
step - 26:22
STEPHANIE- 2:7
still - 6:19; 21:4
STIPULATED - 3:5, 16
stop - 6:7
storm - 26:5
Subscribed- 31:13; 34:22
sworn - 3:10, 12; 4:5; 31:13;
  32:10; 34:2

**T**

testified - 4:6
testimony - 32:11; 34:4
THE- 1:4, 8; 6:4
THEIR- 1:4
third - 11:8
this_____day - 31:14; 34:22
three - 5:20
three-family - 5:20
threw - 22:15
today's - 15:11; 17:9
Took- 12:14
touch - 27:17
touched - 30:18
transcript - 34:3
treatment - 31:3
Trial- 1:16
trial - 3:18
true - 32:11
TRUE- 1:10
tumbling - 13:2
TV- 17:16; 24:21; 25:6; 26:17

Twelve- 8:12
twelve - 15:4
two - 5:18, 24; 11:14; 19:17;
  24:12; 25:7, 18; 26:7
Two- 25:10
two-family - 5:18

**U**

uh-huh's - 5:6
uncle - 20:25
UNDER- 1:4
Uniondale- 2:6
UNITED- 1:2
UNKNOWN- 1:10
up - 6:2; 8:2; 12:19, 24; 24:18;
  28:2, 19

**V**

VERNON- 1:8; 2:10
Vernon- 1:12; 2:12; 4:4, 15,
  19; 10:6; 11:23; 13:14

**W**

waived - 3:9
walk - 25:22
walked - 10:16, 18
Wartburg- 11:22, 25
week - 6:25; 12:8
Westchester- 1:23
WESTCHESTER- 32:5
WHEREOF- 32:16
White- 1:24
whole - 10:15; 13:4; 22:12, 14,
  25
WITNESS- 6:4; 32:16
witness - 31:6; 32:9, 11
witnessed - 10:17
woke - 12:24
words - 5:4, 7

**Y**

year - 7:4, 6; 15:4; 21:15, 19;
  30:4, 9
years - 5:16; 6:18
Yonkers- 6:24; 7:13
YORK- 1:2; 32:4
York- 1:13, 20, 24; 2:6, 13; 4:4,
  15; 32:8
young - 18:17
younger - 16:17; 17:7; 20:21

**EXHIBIT "F"**
**DOCKET NO. 08CV00083**
**FABIAN MCCALLA**
**50-H TRANSCIPT**



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - X
ELIZABETH LYNCH, SIMON LYNCH, ERIC LYNCH,
INFANTS, UNDER THE AGE OF 14, BY THEIR
MOTHER AND NATURAL GUARDIAN JESSICA LYNCH
AND JESSICA LYNCH INDIVIDUALLY AND
RICARDO LYNCH,

               Plaintiffs,

          -against-        08 CIV 00080

CITY OF MOUNT VERNON, THE MOUNT VERNON
POLICE DEPARTMENT AND POLICE OFFICERS
"JOHN DOE", "RICHARD DOE", FICTITIOUS
NAMES, TRUE NAMES UNKNOWN,

               Defendants.

- - - - - - - - - - - - - - - - - - - - - X

HELD AT:         Mount Vernon City Hall
                 One Roosevelt Square
                 Mount Vernon, New York 10550
                 January 14, 2008
                 1:45 p.m.


           Examination before Trial of the

Plaintiff, FABIAN McCALLA, pursuant to Court

Order, held at the above time and place

before a Notary Public of the State of New

York.


J & L REPORTING SERVICE
of Westchester, Inc.
200 East Post Road
White Plains, New York 10601
(914) 682-1888
Lisa Dobbo, Reporter

2

A P P E A R A N C E S:


                    DELL & LITTLE, ESQUIRES
                    Attorneys for the Plaintiffs
                    Office & Post Office Address
                    1274 Reckson Place
                    Uniondale, New York 11556
                    BY:  STEPHANIE G. OVADIA,
                         ESQUIRE



                    CORPORATION COUNSEL
                    MOUNT VERNON
                    Attorneys for the Defendant
                    Office & Post Office Address
                    Mount Vernon City Hall
                    One Roosevelt Square
                    Mount Vernon, New York 10550
                    BY:  HINA SHERWANI, ESQUIRE



A L S O    P R E S E N T:


                    Jessica Lynch

3

IT IS HEREBY STIPULATED AND AGREED, by and between the attorneys for the respective parties herein, that the sealing and filing of the within deposition be waived; that such deposition may be signed and sworn to before any officer authorized to administer an oath, with the same force and effect as if signed and sworn to before the officer before whom said deposition is taken.

IT IS FURTHER STIPULATED AND AGREED, that all objections, except as to form, are reserved to the time of trial.

```
 1                              F. McCALLA                    4

 2                         FABIAN McCALLA, residing at 58

 3                         South 14th Avenue, Mount

 4                         Vernon, New York 10550, having

 5                         been duly sworn by Notary

 6                         Public, Lisa Dobbo, testified

 7                         as follows:

 8       EXAMINATION BY MS. SHERWANI:

 9            Q.    Please state your full name for

10       the record.

11            A.    Fabian McCalla.

12            Q.    Please state your address for

13       the record.

14            A.    58 South 14th Avenue, Mount

15       Vernon, New York 10550.

16            Q.    Mr. McCalla, you were here for

17       the testimony of Ms. Lynch; is that correct?

18            A.    Yes.

19            Q.    I gave some instructions in the

20       beginning that we'll just go over.

21            If you don't understand my question

22       or don't hear my question, please let me

23       know --

24            A.    Yes.

25            Q.    -- and I'll ask it again.
```

```
 1                         F. McCALLA                5

 2              A.    Okay.

 3              Q.    Please use words.

 4              A.    Yes.

 5              Q.    Don't use "uh-huh" or gestures

 6    and just wait until I finish my question to

 7    begin your answer because our reporter can

 8    only take down one person.

 9              A.    Yes.

10              Q.    Sir, do you work?

11              A.    Yes, I do.

12              Q.    Where do you work?

13              A.    Wartburg Home.

14              Q.    What do you do?

15              A.    Environmental technician.

16              Q.    What are your hours?

17              A.    8:00 to 4:00.

18              Q.    How long have you worked there?

19              A.    I've been there like nine

20    years.

21              Q.    Do you have any other jobs?

22              A.    No, I don't.

23              Q.    What's the highest education

24    that you completed?

25              A.    Third form in high school.
```

```
1                              F. McCALLA                    6
2            Q.     Where was that?
3            A.     That's in Jamaica, West Indies.
4            Q.     When did you come to New York?
5            A.     1989.
6            Q.     Since 1989, did you get any
7     training or go to any school here?
8            A.     Yes, I did.
9            Q.     Where was that?
10           A.     That was in the Bronx.  I'm
11    trying to remember the name.
12                  MS. OVADIA:  You can leave a
13                  blank and we'll provide it.
14           A.     _____.
15           Q.     Are you currently married?
16           A.     No, I'm not.
17           Q.     Do you know Alethia Hamilton?
18           A.     Yes, I do.
19           Q.     How do you know her?
20           A.     That's my baby mom.
21           Q.     How old is your oldest child?
22           A.     Oldest is fourteen years.
23           Q.     Alethia is the mom?
24           A.     Yes, she is.
25           Q.     How many other children do you
```

```
 1                              F. McCALLA                    7

 2        have together?

 3                A.      Three, three other.

 4                Q.      So, four altogether?

 5                A.      Four altogether.

 6                Q.      What is your fourteen year

 7        old's name?

 8                A.      Rosalie Hamilton.

 9                Q.      And the others?

10                A.      Anthony McCalla, Alex McCalla

11        and Rhiana McCalla.

12                Q.      How old is Anthony now?

13                A.      Anthony is twelve years.

14                Q.      And Alex?

15                A.      Alex is eight years.

16                Q.      Rhiana?

17                A.      Five years.

18                Q.      A year before this incident,

19        did you personally know anyone that was

20        arrested by the Mount Vernon Police

21        Department --

22                A.      No, I didn't.

23                Q.      -- either anyone that you

24        worked with or anyone that you socialized

25        with that was arrested by the Mount Vernon
```

1                              F. McCALLA                    8

2          Police Department in the year before this

3          incident?

4                    A.    Not that I know of, no.

5                    Q.    Describe for me how you first

6          learned that there was police presence at

7          the house at 58 South 14th?

8                    A.    I was in bed at the time

9          sleeping.  I heard doors bursting down, see

10         guns.

11                   Q.    Did you see the officers?

12                   A.    Yes, I did.

13                   Q.    How many officers were there on

14         your floor?

15                   A.    There was six or seven

16         officers.

17                   Q.    What did they proceed to do?

18                   A.    They proceeded -- came in

19         waiving guns, handcuffed me on the bed and

20         was there searching the place.

21                   Q.    Did they tell you what they

22         were looking for?

23                   A.    No, they did not.

24                   Q.    Did they ask for you by name?

25                   A.    No.

1                         F. McCALLA                    9

2              Q.    Did they ever refer to you as

3     Mr. McCalla?

4              A.    No, they did not.

5              Q.    I'm going to show you

6     Defendant's C.

7                         (Handed)

8              Q.    Is that you in the picture,

9     sir?

10             A.    Yes.

11             Q.    Who else is in that picture?

12             A.    That's my baby mom's sister

13    Karina, her daughter Jackie, my daughter

14    Rosalie, Jahmarcus, her son.

15             Q.    Rosalie is wearing the striped

16    shirt?

17             A.    Yes.

18             Q.    There's a photograph on the

19    wall.

20             Do you know who that is a photograph

21    of?

22             A.    Yeah, that's my two sons.

23             Q.    This is the second floor --

24             A.    Second floor.

25             Q.    -- of the house?

```
1                          F. McCALLA                    10

2              A.    Yes.

3              Q.    And you're still living there?

4              A.    Yes.

5              Q.    When did you first move there?

6              A.    I was there from like '90.

7              Q.    1990?

8              A.    Yeah.

9              Q.    Does anyone live on the third

10        floor?

11             A.    There is no third floor.

12             Q.    There is no third floor, sorry.

13        When Ms. Lynch moved out for the six,

14        seven months from the basement, did anyone

15        else move in?

16             A.    No, no one.

17             Q.    Did any of the sisters or

18        brothers live in the basement while she

19        wasn't there?

20             A.    No.

21             Q.    How long of a period of time

22        did the police officers stay on the second

23        floor?

24             A.    They was there from like 5:00

25        until like after 8:00 in the morning.
```

1                            F. McCALLA            11

2          Q.    During those hours, describe

3     for me what they did.

4          A.    Came in waiving the gun,

5     handcuffed me on the bed and searching the

6     place.

7          Q.    How many were searching?

8          A.    Approximately all.  They were

9     all over the place.

10          Q.    Describe the layout of the

11     floor for me; is there one entrance to the

12     second floor or more than one?

13          A.    One entrance.

14          Q.    As you enter, what do you enter

15     into?

16          A.    To the living room.

17          Q.    Is the living room what's

18     depicted in Defendant's C?

19          A.    Yes, it is.

20          Q.    Did they search the living

21     room?

22          A.    No.

23          Q.    They were searching bedrooms?

24          A.    Bedrooms, yeah, the attic.

25          Q.    There's an entrance to the

F. McCALLA                    12

1
2          attic from your floor?
3                    A.     Yes.
4                    Q.     Where is that entrance?
5                    A.     Right above the entrance to my
6          bedroom.
7                    Q.     Is it a pull down staircase?
8                    A.     Yes, a pull down, yes.
9                    Q.     Sir, did they handcuff anyone
10         else?
11                   A.     No, only me.
12                   Q.     Did they touch you in any other
13         way besides handcuffing you?
14                   A.     Yes.
15                   Q.     What did they do?
16                   A.     After I had the white plastic,
17         I told them it was too tight and he pulled
18         it up, pulled it more.
19                   Q.     He pulled it more?
20                   A.     Yes.
21                   Q.     Then what happened?
22                   A.     It was squeezing even more.
23                   Q.     Did they take off the handcuffs
24         before they left?
25                   A.     Yeah.

F. McCALLA                13

1

2    Q.    Besides telling them that they

3    were tight, the handcuffs, did you say

4    anything else to the officers?

5    A.    No, I did not.

6    Q.    Describe for me -- the picture

7    shows there's a dining area next to the

8    living room.

9    A.    Yes.

10    Q.    Is there any furniture in the

11    dining area?

12    A.    Yes.

13    Q.    What does that consist of?

14    A.    Cabinet, keep glasses and all

15    that, the table.

16    Q.    Did they search the cabinet?

17    A.    No, they did not.

18    Q.    What other rooms are there

19    besides the living room and dining room?

20    A.    My room and another room,

21    sister Karina's room and the room for the

22    kids.

23    Q.    So, there's three bedrooms?

24    A.    Yes.

25    Q.    And the room for the kids that

1                    F. McCALLA           14

2       you described, your kids are in there and

3       Karina's kids, also?

4            A.    No, my kids.

5            Q.    Just your kids?

6            A.    Yes.

7            Q.    Karina's kids are with her in

8       her room?

9            A.    Yes.

10           Q.    Karina's bedroom in the middle

11      of the two rooms, like can you describe that

12      for me?

13           A.    Actually, it comes right in the

14      living room to the left.

15           Q.    Your room and the kids' room

16      are together?

17           A.    Not together, no.

18           Q.    Describe your room for me, what

19      does it have in it furniture wise, appliance

20      wise?

21           A.    Two dressers, a bed, TV stand,

22      closet.  That's it.

23           Q.    Did they search that room?

24           A.    Yes, they did.

25           Q.    Were things taken out of the

1                          F. McCALLA                    15

2     drawers?

3              A.    Yes, things were taken out on

4     the floor, like that.

5              Q.    Was anything damaged in your

6     room?

7              A.    Yes, the closet doors were

8     broken down, the living room door, my room

9     door.

10             Q.    Was the closet door locked?

11             A.    Yes.

12             Q.    Is there an iron gate to the

13    house at 58?

14             A.    Yes.

15             Q.    Are there pad locks located to

16    the main entrances?

17             A.    No.  Actually, it's just a

18    chain with a lock but it's just -- just put

19    over.  It's not really locked or anything

20    like that.

21             Q.    How many are there?

22             A.    Just one.

23             Q.    Is there anyplace where there

24    are four locks situated?

25             A.    No.

1                              F. McCALLA              16

2              Q.    Did they ask you to open the

3      closet door before they broke it down?

4              A.    No, they did not.

5              Q.    You told me there was a dresser

6      in your room?

7              A.    Yes, two dressers.

8              Q.    How many drawers did the

9      dressers have?

10             A.    One consists of like six and

11     the other five.

12             Q.    What about the kids' room that

13     you described, tell me the furniture that's

14     in the kids' room.

15             A.    They have a dresser inside

16     there -- two dressers, bunk bed, another

17     bed, television, television stand, yeah.

18             Q.    Was anything broken in the

19     kids' room?

20             A.    Just the door to entrance.

21             Q.    Was it locked at the time?

22             A.    Yeah.

23             Q.    But the kids were inside

24     sleeping?

25             A.    Yes, some were sleeping.

```
1                            F. McCALLA              17
2       Rosalie was up because she was getting ready
3       to go to school.
4             Q.    Besides the doors that you
5       described, was anything else broken on the
6       second floor?
7             A.    The attic door, entrance to the
8       attic door.
9             Q.    Was that locked, as well?
10            A.    Yeah.
11            Q.    Describe for me the lock on
12      that door.
13            A.    It's just -- no lock, just pull
14      up.  At the time we had like some because it
15      was kind of -- some screws to close it.
16      They tore it down.
17            Q.    You had it screwed shut,
18      basically?
19            A.    Right.
20            Q.    Did they ask you to go to the
21      station with them after they left --
22            A.    No.
23            Q.    -- as they were leaving?
24            A.    No, they did not.
25            Q.    Did you ever go to the police
```

```
 1                          F. McCALLA                    18

 2      station?

 3               A.     Yes, I did.

 4               Q.     When was that?

 5               A.     After they left.

 6               Q.     What did you do, did you go

 7      with Ms. Lynch?

 8               A.     Yes, yes I did.

 9               Q.     Anything else happen besides

10      what she already described?

11               A.     No, nothing else.

12               Q.     Did you fill out any paperwork?

13               A.     I personally did not, no.

14               Q.     Did you ever go back to the

15      police station after that date?

16               A.     No.

17               Q.     Did you ever talk to any police

18      officers or anyone from the police

19      department regarding the incident after that

20      date?

21               A.     No, I didn't.

22               Q.     Has anyone approached you after

23      that date to discuss the incident with

24      you --

25               A.     No.
```

1                               F. MCCALLA                    19

2                Q.     -- someone you know or a friend

3         or anyone like that?

4                A.     No.

5                Q.     Did anyone inquire, did the

6         police come to your house, anything like

7         that?

8                A.     No.

9                Q.     Did you seek any medical

10        treatment after this incident?

11               A.     No, I did not.

12               Q.     At anytime, did any of the

13        officers ever touch any of the children or

14        Ms. Alethia Hamilton?

15               A.     No.

16               Q.     Is there anything that you wish

17        to add that hasn't been discussed?

18               A.     Yes.  Coming inside you have a

19        sensor light.  The morning that they came

20        after I noticed it wasn't -- it was like

21        unscrewed, it was unscrewed.

22               Q.     They unscrewed that?

23               A.     Yeah.

24               Q.     Anything else?

25               A.     That's it.

F. McCALLA                    20

Q.    How about the cameras that are
located around the house?

A.    Right.

Q.    Do you know who installed those
cameras?

A.    Actually, it's me.  I put it up
just to see what is going on inside the
yard.

Q.    When did you do that?

A.    That was like early part of
that year, 2006.

Q.    Is that the kind of work that
you do?

A.    No.

Q.    Did you have someone come and
do it or you did it yourself?

A.    I did it myself.

Q.    The connection to the TV
screen, you did all of that work yourself?

A.    Yeah.

Q.    It shows you the outside of the
house?

A.    Right.

Q.    Does it show you anything else?

1                              F. McCALLA                21

2              A.      Just outside the house.

3              Q.      What was the reason for that?

4              A.      Just security reasons.

5              Q.      Had there been a security

6        problem?

7              A.      Breaking car glasses, yeah.

8              Q.      Someone had done that?

9              A.      Yeah.

10             Q.      Had you made a police report

11       regarding that?

12             A.      No, I don't.

13             Q.      Had anyone forcibly entered the

14       house before you installed the camera?

15             A.      No.

16                     MS. SHERWANI:  I have nothing

17                further.  Thank you for your time.

18                     (Whereupon this examination

19                concluded at 2:03 p.m.)

20

21                           _____

22                           FABIAN McCALLA

23       Subscribed and sworn to
         before me this_____day
24       of_____, 2008.

25       _____
              Notary Public

22

C E R T I F I C A T E


STATE OF NEW YORK        )
                         ) ss.:
COUNTY OF WESTCHESTER)


       I, LISA DOBBO, a Shorthand Reporter and Notary Public within and for the State of New York, do hereby certify:


       That FABIAN McCALLA, the witness whose deposition is hereinbefore set forth, was duly sworn by me, and that such deposition is a true record of the testimony given by the witness.


       I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.


       IN WITNESS WHEREOF, I have hereunto set my hand this 16th day of January, 2008.


       LISA DOBBO
       SHORTHAND REPORTER

23

REQUESTS

Page 6            Indicate name of school in the
                 Bronx.

24

## ERRATA SHEET

The following corrections, additions or deletions were noted on the transcript of the testimony which I gave in the above-captioned matter held on 1/14/08:

Page____Line____SHOULD READ:_____

REASON FOR CHANGE:_____

Page____Line____SHOULD READ:_____

REASON FOR CHANGE:_____

Page____Line____SHOULD READ:_____

REASON FOR CHANGE:_____

Page____Line____SHOULD READ:_____

REASON FOR CHANGE:_____

Page____Line____SHOULD READ:_____

REASON FOR CHANGE:_____

Page____Line____SHOULD READ:_____

REASON FOR CHANGE:_____

Page____Line____SHOULD READ:_____

REASON FOR CHANGE:_____


_____
FABIAN McCALLA

Subscribed and sworn to
before me this_____day
of_____, 2008.

_____
Notary Public

25

**'**

'90 - 10:6

**0**

00080 - 1:7
08 - 1:7

**1**

1/14/08 - 24:4
10550 - 1:14; 2:13; 4:4, 15
10601 - 1:24
11556 - 2:6
1274 - 2:6
14 - 1:4, 14
14th - 4:3, 14; 8:7
16th - 22:17
1989 - 6:5
1990 - 10:7
1:45 - 1:15

**2**

200 - 1:24
2006 - 20:12
2008 - 1:14; 21:23; 22:17; 24:23
2:03 - 21:19

**4**

4:00 - 5:17

**5**

58 - 4:2, 14; 8:7; 15:13
5:00 - 10:24

**6**

6 - 23:5
682-1888 - 1:25

**8**

8:00 - 5:17; 10:25

**9**

914 - 1:25

**A**

above-captioned - 24:4
action - 22:13
add - 19:17
additions - 24:3
address - 4:12
Address - 2:5, 11
administer - 3:11
AGE- 1:4
AGREED - 3:6, 17
Alethia - 6:17, 23; 19:14
Alex - 7:10, 14
altogether - 7:4
AND - 1:4, 9; 3:5, 16

answer - 5:7
Anthony - 7:10, 12
anyplace - 15:23
anytime - 19:12
appliance - 14:19
approached - 18:22
area - 13:7, 11
arrested - 7:20, 25
AT - 1:13
attic - 11:24; 12:2; 17:7
Attorneys - 2:5, 11
attorneys - 3:6
authorized - 3:10
Avenue - 4:3, 14

**B**

baby - 6:20; 9:12
basement - 10:14, 18
bed - 8:8, 19; 11:5; 14:21; 16:16
bedroom - 12:6; 14:10
bedrooms - 11:23; 13:23
Bedrooms - 11:24
begin - 5:7
beginning - 4:20
between - 3:6
blank - 6:13
blood - 22:14
Breaking - 21:7
broke - 16:3
broken - 15:8; 16:18; 17:5
Bronx - 6:10; 23:5
brothers - 10:18
bunk - 16:16
bursting - 8:9
BY - 1:4; 2:7, 13; 4:8

**C**

Cabinet - 13:14
cabinet - 13:16
camera - 21:14
cameras - 20:2, 6
captioned - 24:4
car - 21:7
certify - 22:8, 13
chain - 15:18
CHANGE - 24:7, 9, 11, 13, 15, 17, 19
child - 6:21
children - 6:25; 19:13
CITY - 1:8
City - 1:13; 2:12
CIV - 1:7
close - 17:15
closet - 14:22; 15:7, 10; 16:3
Corning - 19:18
completed - 5:24
concluded - 21:19
connection - 20:19
consist - 13:13
consists - 16:10
CORPORATION - 2:10
correct - 4:17
corrections - 24:3
COUNSEL - 2:10
COUNTY - 22:5
Court - 1:18
COURT - 1:2

**D**

damaged - 15:5
date - 18:15, 20, 23
daughter - 9:13
Defendant - 2:11
Defendants - 9:6; 11:18
Defendants - 1:11
deletions - 24:3
DELL - 2:4
Department - 7:21; 8:2
DEPARTMENT - 1:9
department - 18:19
depicted - 11:18
deposition - 3:8, 13; 22:10
Describe - 8:5; 11:10; 13:6; 14:18; 17:11
describe - 11:2; 14:11
described - 14:2; 16:13; 17:5; 18:10
dining - 13:7, 11, 19
discuss - 18:23
discussed - 19:17
DISTRICT - 1:2
Dobbo - 1:25; 4:6
DOBBO - 22:7, 21
DOE - 1:9
done - 21:8
door - 15:8-10; 16:3, 20; 17:7, 12
doors - 8:9; 15:7; 17:4
down - 5:8; 8:9; 12:7; 15:8; 16:3; 17:16
drawers - 15:2; 16:8
dresser - 16:5, 15
dressers - 14:21; 16:7, 9, 16
duly - 4:5; 22:10
During - 11:2

**E**

early - 20:11
East - 1:24
education - 5:23
effect - 3:12
eight - 7:15
either - 7:23
ELIZABETH - 1:3
enter - 11:14
entered - 21:13
entrance - 11:11, 13, 25; 12:4; 16:20; 17:7
entrances - 15:16
Environmental - 5:15
ERIC - 1:3
ERRATA - 24:2
ESQUIRE - 2:7, 13
ESQUIRES - 2:4
EXAMINATION - 4:8
Examination - 1:17
examination - 21:18
except - 3:17

**F**

FABIAN - 1:18; 4:2; 21:21; 22:9; 24:21
Fabian - 4:11
FICTITIOUS - 1:9
filing - 3:8
fill - 18:12
finish - 5:6
first - 8:5; 10:5
five - 16:11

Five - 7:17
floor - 8:14; 9:23; 10:10-12, 23; 11:11; 12:2; 15:4; 17:6
following - 24:3
follows - 4:7
FOR - 24:7, 9, 11, 13, 15, 17, 19
force - 3:11
forcibly - 21:13
form - 3:18; 5:25
forth - 22:10
four - 7:4; 15:24
Four - 7:5
fourteen - 6:22; 7:6
friend - 19:2
full - 4:9
furniture - 13:10; 14:19; 16:13
FURTHER - 3:16

**G**

gate - 15:12
gestures - 5:5
given - 22:11
glasses - 13:14; 21:7
GUARDIAN - 1:4
gun - 11:4
guns - 8:10, 19

**H**

Hall - 1:13; 2:12
Hamilton - 6:17; 7:8; 19:14
hand - 22:17
handcuff - 12:9
handcuffed - 8:19; 11:5
handcuffing - 12:13
handcuffs - 12:23; 13:3
Handed - 9:7
hear - 4:22
heard - 8:9
HELD - 1:13
held - 1:19; 24:4
hereby - 22:8
HEREBY - 3:5
herein - 3:7
hereinbefore - 22:10
hereunto - 22:17
high - 5:25
highest - 5:23
HINA - 2:13
Home - 5:13
hours - 5:16; 11:2
house - 8:7; 9:25; 15:13; 19:6; 20:3, 23; 21:2, 14

**I**

IN - 22:16
Inc - 1:23
incident - 7:18; 8:3; 18:19, 23; 19:10
Indicate - 23:5
Indies - 6:3
INDIVIDUALLY - 1:5
INFANTS - 1:4
inquire - 19:5
inside - 16:15, 23; 19:18; 20:8
installed - 20:5; 21:14
instructions - 4:19
interested - 22:14
iron - 15:12
IS - 3:5, 16
IT - 3:5, 16

**J**

Jackie - 9:13
Jahmarcus - 9:14
Jamaica - 6:3
January - 1:14; 22:17
Jessica - 2:17
JESSICA - 1:4
jobs - 5:21
JOHN - 1:9

**K**

Karina - 9:13
Karinas - 13:21; 14:3, 7, 10
keep - 13:14
kids - 13:22, 25; 14:2-5, 7; 16:23
kids' - 14:15; 16:12, 14, 19
kind - 17:15; 20:13

**L**

layout - 11:10
learned - 8:6
leave - 6:12
leaving - 17:23
left - 12:24; 14:14; 17:21; 18:5
light - 19:18
Lisa - 1:25; 4:6
LISA - 22:7, 21
LITTLE - 2:4
live - 10:9, 18
living - 10:3; 11:16, 20; 13:8, 19; 14:14; 15:8
located - 15:15; 20:3
lock - 15:18; 17:11, 13
locked - 15:10, 19; 16:21; 17:9
locks - 15:15, 24
looking - 8:22
Lynch - 2:17; 4:17; 10:13; 18:7
LYNCH - 1:3

**M**

main - 15:16
marriage - 22:14
married - 6:15
matter - 22:15; 24:4
McCalla - 1:18; 4:2, 11, 16; 7:10; 9:3; 21:21; 22:9; 24:21
medical - 19:9
middle - 14:10
mom - 6:20, 23
mom's - 9:12
months - 10:14
morning - 10:25; 19:19
MOTHER - 1:4
MOUNT - 1:8; 2:10
Mount - 1:13; 2:12; 4:3, 14; 7:20, 25
move - 10:5, 15
moved - 10:13
MS - 4:8; 6:12; 21:16

**N**

name - 4:9; 6:11; 7:7; 8:24; 23:5
NAMES - 1:10
NATURAL - 1:4
NEW - 1:2; 22:4

New- 1:14, 20, 24; 2:6, 13; 4:4, 15; 6:4; 22:8
next - 13:7
nine - 5:19
Notary- 1:20; 4:5; 21:25; 22:7; 24:24
noted - 24:3
nothing - 18:11; 21:16
noticed - 19:20

## O

oath - 3:11
objections - 3:17
OF- 1:2, 4, 8; 22:4
Office- 2:5, 11
officer - 3:10, 13
officers - 8:11, 13, 16; 10:22; 13:4; 18:18; 19:13
OFFICERS- 1:9
old - 6:21; 7:12
old's - 7:7
oldest - 6:21
Oldest- 6:22
One- 1:13; 2:12; 11:13; 16:10
one - 5:8; 10:16; 11:11; 15:22
open - 16:2
Order- 1:19
outcome - 22:14
outside - 20:22; 21:2
OVADIA- 2:7; 6:12

## P

p.m - 1:15; 21:19
pad - 15:15
Page - 23:5
Page____Line____
    SHOULD - 24:6, 8, 10, 12, 14, 16, 18
paperwork - 18:12
part - 20:11
parties - 3:7; 22:13
period - 10:21
person - 5:8
personally - 7:19; 18:13
photograph - 9:18, 20
picture - 9:8, 11; 13:6
place - 1:19; 8:20; 11:6, 9
Place- 2:6
Plains - 1:24
Plaintiff - 1:18
Plaintiffs - 1:6; 2:5
plastic - 12:16
Police - 7:20; 8:2
POLICE- 1:9
police - 8:6; 10:22; 17:25; 18:15, 17-18; 19:6; 21:10
Post- 1:24; 2:5, 11
presence - 8:6
problem - 21:6
proceed - 8:17
proceeded - 8:18
provide - 6:13
Public- 1:20; 4:6; 21:25; 22:7; 24:24
pull - 12:7; 17:13
pulled - 12:17
pursuant - 1:18
put - 15:18; 20:7

## R

READ- 24:6, 8, 10, 12, 14, 16,

18
ready - 17:2
really - 15:19
REASON- 24:7, 9, 11, 13, 15, 17, 19
reason - 21:3
reasons - 21:4
Reckson- 2:6
record - 4:10, 13; 22:11
refer - 9:2
regarding - 18:19; 21:11
related - 22:13
remember - 6:11
report - 21:10
Reporter- 1:25; 22:7
reporter - 5:7
REPORTER- 22:22
REPORTING- 1:23
REQUESTS- 23:3
reserved - 3:18
residing - 4:2
respective - 3:7
Rhiana- 7:11, 16
RICARDO- 1:5
RICHARD- 1:9
Road- 1:24
room - 11:16, 21; 13:8, 19-21, 25; 14:8, 14-15, 18, 23; 15:6, 8; 16:6, 12, 14, 19
rooms - 13:18; 14:11
Roosevelt- 1:13; 2:12
Rosalie- 7:8; 9:14; 17:2

## S

school - 5:25; 6:7; 17:3; 23:5
screen - 20:20
screwed - 17:17
screws - 17:15
sealing - 3:7
search - 11:20; 13:16; 14:23
searching - 8:20; 11:5, 7, 23
second - 9:23; 10:22; 11:12; 17:6
Second- 9:24
security - 21:4
see - 8:9, 11; 20:8
seek - 19:9
sensor - 19:19
SERVICE- 1:23
set - 22:10, 17
seven - 8:15; 10:14
SHEET- 24:2
SHERWANI- 2:13; 4:8; 21:16
shirt - 9:16
Shorthand- 22:7
SHORTHAND- 22:22
show - 9:5; 20:25
shows - 13:7; 20:22
shut - 17:17
signed - 3:9, 12
SIMON- 1:3
sister - 9:12; 13:21
sisters - 10:17
situated - 15:24
six - 8:15; 10:13; 16:10
sleeping - 8:9; 16:24
socialized - 7:24
someone - 19:2; 20:16
Someone- 21:8
son - 9:14
sons - 9:22
sorry - 10:12
South- 4:3, 14; 8:7
SOUTHERN- 1:2

Square- 1:13; 2:12
squeezing - 12:22
ss - 22:4
staircase - 12:7
stand - 14:21; 16:17
state - 4:9, 12
STATE- 22:4
State- 1:20; 22:8
STATES- 1:2
station - 17:21; 18:2, 15
stay - 10:22
STEPHANIE- 2:7
still - 10:3
STIPULATED - 3:5, 16
striped - 9:15
Subscribed - 21:22; 24:22
sworn - 3:10, 12; 4:5; 21:22; 22:10; 24:22

## T

table - 13:15
technician - 5:15
television - 16:17
testified - 4:6
testimony - 4:17; 22:11; 24:4
THE- 1:4, 8
THEIR- 1:4
Third- 5:25
third - 10:9, 11
this_____day - 21:23; 24:22
Three- 7:3
three - 7:3; 13:23
tight - 12:17; 13:3
together - 7:2; 14:16
tore - 17:16
touch - 12:12; 19:13
training - 6:7
transcript - 24:3
treatment - 19:10
Trial- 1:17
trial - 3:18
true - 22:11
TRUE- 1:10
trying - 6:11
TV- 14:21; 20:19
twelve - 7:13
Two- 14:21
two - 9:22; 14:11; 16:7, 16

## U

UNDER- 1:4
Uniondale- 2:6
UNITED- 1:2
UNKNOWN- 1:10
unscrewed - 19:21
up - 12:18; 17:2, 14; 20:7

## V

VERNON- 1:8; 2:10
Vernon- 1:13; 2:12; 4:4, 15; 7:20, 25

## W

wait - 5:6
waived - 3:9
waiving - 8:19; 11:4
wall - 9:19
Wartburg- 5:13
wearing - 9:15

West- 6:3
WESTCHESTER- 22:5
Westchester- 1:23
WHEREOF- 22:16
White- 1:24
white - 12:16
wise - 14:19
wish - 19:16
WITNESS- 22:16
witness - 22:10
words - 5:3

## Y

yard - 20:9
year - 7:6, 18; 8:2; 20:12
years - 5:20; 6:22; 7:13, 15, 17
YORK- 1:2; 22:4
York- 1:14, 21, 24; 2:6, 13; 4:4, 15; 6:4; 22:8
yourself - 20:17, 20